UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

DEANDRE AUSTIN,

                    Petitioner,                    Case No. 2:22-cv-231

v.                                                 Honorable Robert J. Jonker

KRISTOPHER TASKILA,

                    Respondent.
_____/

## OPINION

    This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner DeAndre Austin is incarcerated with the Michigan Department of Corrections at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan. On March 15, 2018, following a six-day jury trial in the Wayne County Circuit Court, Petitioner was convicted of first-degree felony-murder, in violation of Mich. Comp. Laws § 750.316, three counts of armed robbery, in violation of Mich. Comp. Laws § 750.529, and one count of using a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On April 9, 2018, the court sentenced Petitioner to a prison term of life without parole for murder, 1 to 15 years for each armed robbery conviction, and 2 years for felony-firearm.

    On November 5, 2022, Petitioner filed his habeas corpus petition raising four grounds for relief, as follows:

    I.    Insufficiency of the Evidence—the felony-murder charge didn't fit the facts of the case . . . [because] the murder didn't occur because of the risk of the robberies, but because the shooter was attacked first.

    II.    Trial court gave an improper explanation of the reasonable-doubt standard, violating [Petitioner's] 14th and 6th amendment right[s].

III.    Trial counsel was ineffective for failing to object to [the] improper explanation of the reasonable-doubt standard.

IV.    Trial counsel was ineffective for failing to request a voluntary manslaughter instruction. A rational view of the evidence shows that the shooter only fired when, and once [the driver] attacked him, and that the shooting was the result of temporary excitement. Counsel offered no strategic reason for not requesting such [an] instruction.

(Pet., ECF No. 1, PageID.5, 7–8, 10.) Respondent contends that Petitioner's grounds for relief are meritless.[1] (ECF No. 6.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

[Petitioner's] convictions arise from the fatal shooting of a limousine driver, Devin Lowe, and the robbery of Lowe's three patrons following a concert in Detroit. On April 14, 2017, three young men from Toledo, Ohio—Jameson Sheely, Scott Zaborowski, and Thomas Stover (collectively "the three friends")—went to Detroit to attend a concert at the Fox Theater. They traveled from Toledo to Detroit in a limousine ("limo") rented for them by Sheely's father. The three friends were drinking champagne and vodka in the limo and two of them were also smoking

---

[1] Respondent also contends that habeas ground II is procedurally defaulted, and that habeas ground III is unexhausted. (ECF No. 6, PageID.37–38.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

marijuana. After the concert, which ended around midnight, the three friends could not immediately locate the limo. After several phone calls and a visit to a nearby bar for some drinks, the three friends found the limo parked across the street from the Fox Theater.

Sheely acknowledged that he was intoxicated at this point. Lowe asked the group if they wanted to go to another bar, the Delux Lounge near Greektown, and the friends agreed. They drank some more and danced at the Delux. Lowe went into the bar as well. They stayed at the Delux until 2:00 or 3:00 a.m., when they left with two African-American men who they met at the Delux Lounge. Surveillance videos from the Delux Lounge and nearby locations showed the three friends, Lowe, and the two other men get into the limo after leaving the Delux. One of the other two men, who was wearing a Chicago Bears starter jacket, was identified as Donta Etchen. The other man was wearing a black jacket. Etchen identified [Petitioner], whom Etchen had known for some time, as the man wearing the black jacket. Lowe told the three friends that he intended to drop the other two men off at a gas station.

As the limo pulled away from the Delux, an argument began that first involved Lowe and Etchen and later included the man in the black jacket. The argument concerned drugs, and Lowe was complaining about the quality of some cocaine. The three friends, who were still drinking as Lowe drove to the gas station, tried to end the argument, telling Lowe that they would reimburse him and he did not have to worry about losing money. After they arrived at the gas station, Lowe got out of the driver's seat and moved into the rear passenger seat. Lowe and the other two men began discussing a "trade" or refund involving cocaine that Lowe had purchased. Lowe returned to the front seat, and then Etchen and Stover got out of the limo and went inside the convenience store at the gas station. When they returned, Lowe was sitting in the middle of the back seat. Stover got back into his seat, and Etchen stood by the side door.

Sheely testified that he heard a loud pop, and then heard more pops, about seven in all. He did not immediately know what was going on. Sheely then saw that the man in the black jacket had a gun, which he pointed at Sheely's forehead, and said, "Give me your sh*t, motherf**ker." Sheely gave the man in black his watch, and the man ripped off his necklace and bracelet. The man in the black jacket also pointed the gun at the other two friends and took jewelry from Stover but refused to take Zaborowski's watch. After the shooter left, the three friends ran inside the gas station and called the police. According to Sheely, no one other than the man with the black jacket had a gun that night. Sheely denied hearing Lowe threaten the shooter before Lowe was shot. After the shooting, Sheely was shown a photographic lineup and identified another person as the shooter. At trial, Sheely testified that he did not see anyone in the courtroom who had been in the limo on the night of the shooting.[1]

Several items recovered from inside the limo were tested for DNA and compared to reference DNA swabs from Sheely, Stover, Zaborowski, Etchen, Lowe, and

[Petitioner], as well as Jovan McDade, who had been identified as another possible suspect. None of the DNA profiles developed from evidence collected from the crime scene matched either Etchen or McDade. A cigarette butt had a DNA profile that originated from three donors. There was a strong probability that Sheely and [Petitioner] were two of the contributors, and the third was not identified.

Detective Andrew Guntzviller, the officer-in-charge, testified that surveillance video from the night of the shooting was distributed to news outlets, and the public was invited to call in with any information about a suspect. The police received a tip identifying Jovan McDade as a potential suspect in the case. According to Guntzviller, McDade did bear some physical resemblance to [Petitioner], the individual identified as "Black" in the surveillance videos, but further investigation failed to link McDade to the crimes. After the police learned that [Petitioner] was a match for DNA found in the limo, his photo was included in a lineup that was shown to Etchen, who identified [Petitioner] as the individual he knew as "Black." [Petitioner] was arrested in Georgia and extradited back to Michigan.

───────────────────

[1] Zaborowski and Stover testified similarly to Sheely that the shooting was precipitated by a dispute over money and drugs. However, Zaborowski identified [Petitioner] in court as the shooter. Etchen testified that he knew [Petitioner] merely as "Black," but identified his photograph as the shooter.

*People v. Austin*, No. 344703, 2020 WL 220018, at *1–2 & n.1 (Mich. Ct. App. Jan. 14, 2020).

Jury selection for Petitioner's trial occurred on March 5, 2018. (Trial Tr. I, ECF No. 7-9.) Over the course of four days, the jury heard testimony from numerous witnesses, including law enforcement officials, Sheely, Zaborowski, Stover, Etchen, forensic scientists from the Michigan State Police, a firearms and toolmark examiner from the Michigan State Police, and a medical examiner. (Trial Tr. I, II, III, & IV, ECF Nos. 7-9, 7-10, 7-11, 7-12.) On March 14, 2018, the jury heard the parties' closing arguments as well as the court's final jury instructions. (Trial Tr. V, ECF No. 7-13.) On March 15, 2018, the jury returned a guilty verdict. (Trial Tr. VI, ECF No. 7-14, PageID.1000–1001.) Petitioner appeared before the trial court for sentencing on April 9, 2018. (ECF No. 7-15.)

Petitioner, with the assistance of appellate counsel, appealed his convictions and sentences to the Michigan Court of Appeals, raising as his claims for relief the four grounds that he now

raises in his § 2254 petition. (ECF No. 7-16, PageID.1071–1072.) The court of appeals affirmed Petitioner's convictions and sentences on January 14, 2020. *See Austin*, 2020 WL 220018, at *1. The Michigan Supreme Court denied Petitioner's counseled application for leave to appeal on November 19, 2021. *See People v. Austin*, 966 N.W.2d 28 (Mich. 2021).

Petitioner subsequently filed a § 2254 petition in this Court, raising six grounds for relief. *See Austin v. Taskila*, No. 2:22-cv-199, 2022 WL 15694847, at *2 (W.D. Mich. Oct. 28, 2022). The Court dismissed that petition without prejudice because Petitioner had not exhausted his state court remedies for two of his grounds for relief. *See id.* at *1. The Court advised Petitioner that if he did not want to return to state court to pursue his unexhausted claims, he could "file a new petition raising only exhausted claims at any time before the expiration of the limitations period." *Id.* at *4. Petitioner chose not to return to state court, and the instant § 2254 petition followed.

## II.  AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This

standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

### III.    Discussion

### A.      Ground I—Insufficient Evidence

Petitioner's first ground for relief is that the prosecution did not present sufficient evidence to permit the jury to convict Petitioner of felony murder. (Pet., ECF No. 1, PageID.5.) Petitioner argues that "the murder [did not] occur because of the risk of the robberies, but because the shooter was attacked first." (*Id.*)

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable

hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658

F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's

sufficiency challenge:

> When determining whether sufficient evidence has been presented to sustain a
> conviction, a court must view the evidence in a light most favorable to the
> prosecution and determine whether any rational trier of fact could have found the
> defendant guilty beyond a reasonable doubt. *People v. Harris*, 495 Mich. 120, 126;
> 845 N.W.2d 477 (2014); *People v. Wolfe*, 440 Mich. 508, 515–516; 489 N.W.2d
> 748 (1992), amended 441 Mich. 1201 (1992). Circumstantial evidence and
> reasonable inferences arising from that evidence can constitute satisfactory proof
> of the elements of an offense. *Carines*, 400 Mich. at 757. "The standard of review
> is deferential: a reviewing court is required to draw all reasonable inferences and
> make credibility choices in support of the jury verdict." *People v. Bailey*, 310 Mich.
> App. 703, 713; 873 N.W.2d 855 (2015).

*Austin*, 2020 WL 220018, at *5. Although the court of appeals cited state authority as the source

of the standard, *Wolfe* identifies *Jackson* as the source. *See Wolfe*, 489 N.W.2d at 751.

The state court's application of the correct standard eliminates the possibility that the

resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in

*Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different,"
> "opposite in character or nature," or "mutually opposed." Webster's Third New
> International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests
> that the state court's decision must be substantially different from the relevant
> precedent of this Court. The Fourth Circuit's interpretation of the "contrary to"
> clause accurately reflects this textual meaning. A state-court decision will certainly
> be contrary to our clearly established precedent if the state court applies a rule that
> contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not

"contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our
> cases to the facts of a prisoner's case would not fit comfortably within
> § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court
> decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland*

[*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the court of appeals' conclusion regarding the sufficiency of the evidence is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The court of appeals first set forth the elements for both felony murder and larceny. *See Austin*, 2020 WL 220018, at *6. The court of appeals noted that while the felony murder doctrine does not apply if the intent to commit larceny is not formed until after the homicide occurs, a murder committed during an unbroken chain of events regarding the underlying felony qualifies as a murder committed in perpetration of that felony. *See id.* at *6–7. The court of appeals went on to discuss the factors a court should analyze to determine whether the murder did take place during the unbroken chain of events. *See id.* at *7. The court of appeals then applied the sufficiency standard as follows:

> In the present case, we conclude that there was sufficient evidence to support [Petitioner's] conviction of felony murder. The jury could find that the evidence showed a "causal connection" between the underlying felonies of the larcenies committed against the three friends and the murder of the limo driver. Indeed, the jury could reasonably have inferred that [Petitioner] intended to steal from the limo's occupants when he got into the vehicle, and even when he began interacting with them at the Delux Lounge and identified them as robbery targets. As the prosecution noted:

10

> Under this interpretation of the evidence, by the time [Petitioner] killed Lowe, he had already taken several steps toward the larcenies he ultimately committed—he had identified his victims; he had gotten into a confined space with his victims while in possession of a concealed, deadly weapon; he had isolated the victims from potential bystanders by asking the driver to drive to a deserted gas station; and then he had intimidated his intended victims into compliance by brandishing his weapon. As a result, the jury could reasonably have concluded that at the time [Petitioner] fired the fatal bullets into Lowe's body, he was well into the *res gestae* of the larcenies he was about to consummate.

> Whether [Petitioner's] conduct that led to the shooting was controlled by his desire to commit a larceny or determined by his argument over a drug transaction presented an issue for the jury's determination, and under the facts and circumstances of the killing, we will not disturb its finding.

*Id.* at *7–8. The court of appeals' analysis appears to faithfully track the requirements of *Jackson*. The court reviewed the elements that the prosecutor was required to prove and then looked at the evidence presented to see if there was a basis for a rational trier of fact to find that the essential elements were proven beyond a reasonable doubt.

In his § 2254 petition, Petitioner asserts only that there was insufficient evidence to support the felony murder conviction because "the murder [did not] occur because of the risk of the robberies, but because the shooter was attacked first." (Pet., ECF No. 1, PageID.5.) Thus, Petitioner's vague argument appears to boil down to the claim that one must disregard all of the evidence suggesting that Petitioner intended to commit larceny and was "well into the *res gestae*" of doing so. As set forth above, the court of appeals concluded otherwise. To prevail, Petitioner must show that the inferences urged by the appellate court are unreasonable.

Despite Petitioner's assertion, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Petitioner can overcome that presumption with clear and convincing evidence; he has not. He does not offer any evidence to show that the court of appeals' factual determinations are unreasonable on the record.

11

In *Coleman v. Johnson*, 566 U.S. 650, 655 (2012), the Supreme Court provided some guidance with respect to the distinction between a reasonable inference and mere speculation. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation, and it is not a particularly onerous burden. The Court went so far as to say, "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

Petitioner has offered nothing from which this Court could conclude that the court of appeals' inferences were irrational. Certainly, one could interpret the underlying events differently and reach the opposite conclusions, but that does not render the court of appeals' conclusions and inferences irrational. Petitioner, therefore, has failed to meet his burden.

Moreover, by asserting that the murder occurred only because the shooter was attacked first, Petitioner essentially invites this Court to reweigh the witnesses' credibility and resolve all conflicts and make all inferences in his favor. Under *Jackson*, a habeas court is not required to sift through the evidence and place it on one side of the scale or the other for the purpose of assessing whether the jurors' estimation of the balance is correct. Instead, the Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt considering that evidence. It is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are reasonable. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

In sum, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the felony murder verdict is contrary to, or an unreasonable

application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief on habeas ground I.

### B.      Ground II—Reasonable Doubt Jury Instructions

Next, Petitioner contends that the trial court violated his Sixth and Fourteenth Amendment rights by providing "an improper explanation of the reasonable-doubt standard." (Pet., ECF No. 1, PageID.7.) Petitioner suggests that the "improper instruction created a reasonable likelihood that the jury misapplied" the standard. (*Id.*) Petitioner argues further that the explanation "demeaned the standard instruction[] and lowered the prosecution's burden of proof." (*Id.*)

The instructions with which Petitioner takes issue occurred during the voir dire process. The trial court first filled the jury box with twelve prospective jurors. After some preliminary questions were asked of those individuals, the trial court explained that the State had the burden of convincing the jury of Petitioner's guilt "beyond a reasonable doubt." (Trial Tr. I, ECF No. 291.) The court then analogized how the State had to prove all elements of an offense to making a cake, stating that if you did not have an egg, you could not have a cake if the cake recipe called for cake mix, oil, water, and egg. (*Id.*, PageID.292.)

The trial court also explained the difference between any doubt and reasonable doubt by posing a hypothetical question about a patron withdrawing cash from a casino ATM when the patron feels a metal object at the back of his head. (*Id.*, PageID.311.) The court asked a potential juror what he would infer that the person wanted "from the feeling of that metal object." (*Id.*, PageID.312.) The juror replied that the person holding the object wanted the patron's money. (*Id.*)

The trial court then asked another juror if the juror could infer that her child was sad if the child were to come into the house crying. (*Id.*, PageID.313.) The juror responded in the affirmative. (*Id.*) The court then stated: "We're not looking for absolute certainty. But, the—the standard is proof beyond a reasonable doubt. Not any doubt, not a shadow of a doubt, but beyond a reasonable

13

doubt, okay?" (*Id.*) The court also explained that the jury's role was to determine "whether or not, based on the evidence that's presented, the People have proved each and every element, beyond a reasonable doubt. Your job is not to give somebody a break." (*Id.*, PageID.315.)

The trial court then set forth a hypothetical regarding an engaged woman planning her wedding to explain reasonable doubt. (*Id.*, PageID.316–322.) On direct appeal, the court of appeals summarized this hypothetical as follows:

> The court next presented a lengthy hypothetical, challenged by [Petitioner] on appeal, about an engaged woman planning her wedding. After describing the type of wedding the woman wanted, how she watched the bridal station on television, and how she proposed to save money by making placemats and sewing the lace on her wedding gown herself, the court related a scenario whereby the woman received a call from her fiancé who said he needed to cancel their dinner plans because he had to pick up a friend at the airport. As the engaged woman was driving around doing errands, she saw her fiancé and another woman walking into a hotel. She called her fiancé, and his phone went straight to voicemail. The engaged woman waited about two hours, until her fiancé exited the hotel with the other woman, and they hugged and got into his car. When the engaged woman called her fiancé the next day, she asked about his evening and he said it was wonderful, he had dinner with the friend he picked up at the airport, and he told his friend "how blessed and honored" he was to be marrying her. The trial court asked a potential juror if there was a reason, based on these facts, for the engaged woman to doubt that her fiancé was being truthful. The juror agreed and articulated the facts of the hypothetical. The court asked the juror how long it took to reach that conclusion in his mind and the juror indicated that it took minutes. Other jurors responded that it took seconds. The court then reiterated the standard jury instruction on reasonable doubt, stating: "A reasonable doubt is a fair and honest doubt, growing out of the evidence or lack of evidence. It's not merely an imaginary, or a possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that: a doubt that is reasonable, after a careful and considered examination of the facts and circumstances of this case." The court added, "It don't take long."

*Austin*, 2020 WL 220018, at *4.

The trial court also provided the following remarks to conclude its discussion regarding reasonable doubt:

> That's what we're talkin' about. We do this all the time. We'll call somebody: "You got a minute? Girl, let me tell you what happened, today," da, da, da, da, da, da, da. "What you think?" We're asking someone's opinion, who we're giving the facts and circumstances, to use their reason and common sense to come up with a

decision about whether or not that person is being truthful, or not. That's all we're asking you to do. It's simple. That's the burden of proof, okay?

(Trial Tr. I, ECF No. 7-9, PageID.323.)

After the jury was selected and sworn, the trial court provided the following instruction regarding reasonable doubt:

> The defendant is not required to prove his innocence, or to do anything. If you find that the prosecutor has not proven every element, beyond a reasonable doubt— beyond a reasonable doubt, then you must find the defendant not guilty.
>
> A reasonable doubt is a fair and honest doubt, growing out of the evidence, or the lack of evidence. It is not merely an imaginary, or a possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that: a doubt that is reasonable, after a careful and considered examination of the facts and circumstances of this case.

(*Id.*, PageID.388.) The court reiterated that instruction during the final jury instructions given after both parties rested. (Trial Tr. V, ECF No. 7-13, PageID.957.)

The Fourteenth Amendment's Due Process Clause, as well as the Sixth Amendment's right to a jury trial, require that criminal convictions rest upon a determination that the defendant is guilty beyond a reasonable doubt. *See generally United States v. Gaudin*, 515 U.S. 506 (1995). A constitutionally deficient instruction regarding reasonable doubt constitutes structural error because it necessarily renders a criminal conviction fundamentally unfair. *See Sullivan v. Louisiana*, 508 U.S. 275, 278–82 (1993).

While the Constitution requires that the jury be instructed on the necessity for the State to prove the defendant's guilt beyond a reasonable doubt, *see Jackson*, 443 U.S. at 320 n.14, "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *See Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Essentially, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.*; *see also Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999)

15

(noting that "the Supreme Court does not require any particular form of words be used in advising the jury about the government's burden of proof. . . . There are no magic words that must be included or omitted."). Instead, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140 (1954). An instruction regarding reasonable doubt will violate the Constitution only if "there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [standard set forth in *In re*] *Winship*."[2] *Victor*, 511 U.S. at 6; *see also United States v. Rios*, 830 F.3d 403, 433 (6th Cir. 2016) (noting that the "constitutional question is not whether the burden would be lowered *at all*").

Notably, the Supreme Court has found a jury instruction regarding reasonable doubt unconstitutional in only one case. *See Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), *abrogation in part on other grounds recognized by Estelle v. McGuire*, 502 U.S. 62 (1991). In *Victor*, the Supreme Court provided the following summary of the instruction at issue in *Cage*:

> There, the jurors were told:
>
>> "'[A reasonable doubt] is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*'" *Id.* at 40, 111 S. Ct. at 329 (emphasis added by this Court in *Cage* ).
>
> We held that the highlighted portions of the instruction rendered it unconstitutional:
>
>> "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than

---

[2] In *Winship*, the Supreme Court stated: "The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361 (1970).

> evidentiary certainty, it becomes clear that a reasonable juror could have
> interpreted the instruction to allow a finding of guilt based on a degree of
> proof below that required by the Due Process Clause." *Id.* at 41, 111 S. Ct.
> at 329.

*Victor*, 511 U.S. at 5–6.

Petitioner challenged the trial court's jury instructions regarding reasonable doubt on direct

appeal, arguing that the court's examples [regarding reasonable doubt] 'demeaned the reasonable-

doubt standard,' were 'glib and unbefitting,' and denied him a fair trial." *Austin*, 2020 WL 220018,

at *2. The court of appeals disagreed, stating:

> We are not persuaded that the trial court plainly erred by instructing the jury on
> reasonable doubt. Although there were perhaps some unconventional elements in
> the trial court's explanations of the concept, the trial court recited the model
> criminal jury instruction regarding reasonable doubt multiple times. [Petitioner]
> does not challenge that instruction as erroneous. Given the court's repeated
> recitation of M Crim JI 1.9, which accurately conveyed the concept of reasonable
> doubt, no structural error affecting the trial's fundamental framework occurred.
> Further, [Petitioner] does not identify any statements in the court's attempts to
> illustrate the concept of reasonable doubt that we perceive as plainly erroneous and
> "seriously affected the fairness, integrity, or public reputation of judicial
> proceedings." *Vaughn*, 491 Mich. at 654; *Carines*, 460 Mich. at 763. Furthermore,
> the evidence that [Petitioner] was the person who shot Lowe in the limo is strong,
> given that his DNA was found on a cigarette stub in the limo, all of the eyewitnesses
> identified the man wearing black as the shooter, and Etchen identified [Petitioner]
> as the person wearing black whom he had known for some time. Therefore,
> [Petitioner] is not entitled to appellate relief with respect to this issue. *Id.* at 763–
> 764.

*Austin*, 2020 WL 220018, at *5.

Upon consideration of the foregoing authority, as well as the jury instructions as a whole,

the Court concludes that Petitioner has not met his burden of showing that the court of appeals'

rejection of his claim regarding the jury instructions is contrary to, or an unreasonable application

of, clearly established federal law. As set forth above, "the Constitution does not require that any

particular form of words be used in advising the jury of the government's burden of proof." *See*

*Victor*, 511 U.S. at 5. While the trial court's examples used to illustrate reasonable doubt may have

been unconventional, this Court cannot conclude that they created a reasonable likelihood that the jury thought that they could convict Petitioner "based on proof insufficient" to meet the beyond a reasonable doubt standard. *See id.* at 6. Rather, the trial court used these examples to illustrate the concept of reasonable doubt to the prospective jurors using scenarios and events that they could relate to in life. The instructions in question are by no means similar to the instructions that the Supreme Court found unconstitutional in *Cage*.

Notably, the trial court, on at least two occasions, recited the model jury instruction regarding reasonable doubt to the jury. Petitioner does not take issue with the use of that model jury instruction. In light of the strong evidence against Petitioner, including two witnesses' identifications of Petitioner as the shooter, as well as the fact that Petitioner's DNA was located on cigarette butt located inside the limo, Petitioner has failed to show that the jury instructions in question regarding reasonable doubt "so infected the entire trial that the resulting conviction violates due process." *Harvey v. King*, No. 23-1980, 2024 WL 1917920, at *3 (6th Cir. Apr. 25, 2024) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

In sum, because Petitioner has failed to show that the court of appeals' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to relief on habeas ground II.

### C.      Grounds III & IV—Ineffective Assistance of Trial Counsel

In habeas ground III, Petitioner faults trial counsel for not objecting to the allegedly improper reasonable doubt instruction that the court gave to the jury. (Pet., ECF No. 1, PageID.8.) In habeas ground IV, Petitioner contends that trial counsel was ineffective for not requesting a voluntary manslaughter instruction. (*Id.*, PageID.10.) Petitioner argues that a "rational view of the evidence shows that the shooter only fired when, and once Lowe attacked him, and that the

shooting was the result of a temporary excitement." (*Id.*) Petitioner avers that counsel "offered no strategic reason for not requesting such instruction." (*Id.*)

### 1. Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the

19

distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Scrutiny of the state court's scrutiny

of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double

deference, the question before the habeas court is "whether there is any reasonable argument that

counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41

(6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of

prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*,

562 U.S. at 102)).

Petitioner raised his claims of ineffective assistance on direct appeal, and the court of

appeals addressed them under the following standard:

> To establish ineffective assistance of counsel, a defendant must show that counsel's
> performance was so objectively deficient that counsel was not performing as the
> attorney guaranteed to him by the Sixth Amendment. *Strickland v. Washington*, 466
> U.S. 668, 687–690; 104 S. Ct. 2052; 80 L. Ed. 2d 674 (1984); *People v. Pickens*,
> 446 Mich. 298, 302–303; 521 N.W.2d 797 (1994). [Petitioner] also must establish
> that, but for counsel's unprofessional error, there is a reasonable probability that
> the result of the proceeding would have been different. *Strickland*, 466 U.S. at 691;
> *Pickens*, 446 Mich. at 312. A defendant bears a heavy burden to overcome the
> assumption that he received the effective assistance of counsel. *People v. Seals*, 285
> Mich. App. 1, 17; 776 N.W.2d 314 (2009). Counsel is afforded wide latitude in
> making decisions regarding trial strategy. *People v. Davis*, 250 Mich. App. 357,
> 368–369; 649 N.W.2d 94 (2002).

*Austin*, 2020 WL 220018, at *8. The court of appeals' citation to *Strickland* leaves no question

that the court of appeals applied the correct standard. As explained above, the court of appeals'

application of the correct standard eliminates the possibility that the resulting decision is "contrary

to" clearly established federal law. Petitioner can only overcome the deference afforded state court

decisions if the determinations regarding Petitioner's ineffective assistance claims are

unreasonable applications of *Strickland* or if the state court's resolutions were based on

unreasonable determinations of the facts. 28 U.S.C. 2254(d). The Court, therefore, will consider

whether the court of appeals reasonably applied the standard for Petitioner's claims of ineffective assistance.

### 2.    Ground III—Failure to Object to Reasonable Doubt Instruction

In habeas ground III, Petitioner faults trial counsel for not objecting to the allegedly improper reasonable doubt instruction that the court gave to the jury. (Pet., ECF No. 1, PageID.8.) The court of appeals summarily dismissed this claim, noting that it could not succeed given the conclusion that the trial court's instructions were not erroneous. *See Austin*, 2020 WL 220018, at *8. For the reasons set forth *supra* in Part III.B, as a matter of federal constitutional law, the Court has agreed with the court of appeals that the trial court's reasonable doubt instruction did not violate Petitioner's constitutional rights in any way. The court of appeals' rejection of Petitioner's ineffective assistance claim is neither contrary to nor an unreasonable application of *Strickland*, as "omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Petitioner, therefore, is not entitled to relief on habeas ground III.

### 3.    Ground IV—Failure to Request Voluntary Manslaughter Instruction

As his last ground for relief, Petitioner contends that trial counsel was ineffective for not requesting a voluntary manslaughter instruction. (Pet., ECF No. 1, PageID.10.) Petitioner argues that a "rational view of the evidence shows that the shooter only fired when, and once Lowe attacked him, and that the shooting was the result of a temporary excitement." (*Id.*) Petitioner avers that counsel "offered no strategic reason for not requesting such instruction." (*Id.*)

Petitioner raised this claim on direct appeal, and while the court of appeals agreed that the evidence presented would have arguably supported a voluntary manslaughter instruction, counsel was not ineffective for failing to request it. Specifically, the court of appeals noted:

The evidence in this case would arguably have supported an instruction for voluntary manslaughter if one had been requested. There was evidence of an angry altercation between [Petitioner] and Devin Lowe, the homicide victim, with Lowe accusing defendant of selling him inferior cocaine and cheating him. There was unanimous testimony of the eyewitnesses that the victim "lunged" at, "rushed," or made some sort of sudden movement toward [Petitioner] before the witnesses either heard five to seven shots (Sheely, Zaborowski, and Stover) or saw the gun (Etchen). [Petitioner] notes that trial counsel acknowledged at trial that the victim provoked the shooter, but asserts there is no explanation for counsel's failure to request a manslaughter instruction. However, the record discloses that trial counsel argued to the jury that [Petitioner] was not the person dressed in black in the limo and was not the shooter. Counsel contended that the presence of DNA from [Petitioner], Sheely, and an unidentified third person on a cigarette stub found in the limo must have been caused by a sharing of the cigarette in the bar or on the street, which Sheely then carried back into the limo. A request for an instruction on voluntary manslaughter would have been inconsistent with the defense argument that [Petitioner] was not inside the limo and was not the shooter. Given the defense theory that [Petitioner] was not the shooter, it was not objectively unreasonable for defense counsel to forgo requesting an instruction on voluntary manslaughter.

Moreover, because the jury was presented with the option of convicting [Petitioner] of second-degree murder, but instead convicted him of the greater offense of felony murder, [Petitioner] has not shown that he was prejudiced by counsel's failure to request a manslaughter instruction. See *People v. Wilson*, 265 Mich. App. 386, 396; 695 N.W.2d 351 (2005) (holding that when the jury is given the option to convict of an intermediate lesser offense and rejected it in favor of the greater offense, the defendant is unable to demonstrate prejudice from the failure to instruct on a lesser offense).

*Austin*, 2020 WL 220018, at *9.

Given the double deference owed to the court of appeals' conclusion, it is not for this Court to decide whether counsel's strategy was reasonable. Rather, this Court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The Court, therefore, must consider the court of appeals' assessment of trial counsel's action, not counsel's action itself.[3]

---

[3] Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy and, therefore, can only prevail if he shows that the challenged action **cannot** be considered sound trial strategy. Thus, as the *Harrington* Court noted, "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's

In *Keeble v. United States*, 412 U.S. 205 (1973), the Supreme Court explored the possible outcomes that might follow from giving—or failing to give—a lesser-included offense instruction. The *Keeble* Court acknowledged the potential benefit that Petitioner claims was denied to him at trial:

> [I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction. In the case before us, for example, an intent to commit serious bodily injury is a necessary element of the crime with which petitioner was charged, but not of the crime of simple assault. Since the nature of petitioner's intent was very much in dispute at trial, the jury could rationally have convicted him of simple assault if that option had been presented. But the jury was presented with only two options: convicting the defendant of assault with intent to commit great bodily injury, or acquitting him outright. We cannot say that the availability of a third option—convicting the defendant of simple assault—could not have resulted in a different verdict.

*Keeble*, 412 U.S. at 212–13; *see also Beck v. Alabama*, 447 U.S. 625, 634 (1980) (noting that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard").

The Sixth Circuit has considered similar claims from habeas petitioners in numerous opinions. For example, the Sixth Circuit has held that counsel was not ineffective for failing to request a lesser-included manslaughter instruction in a situation where the petitioner and defense counsel's primary defense theory was that the petitioner was not the one who shot the victim. *See Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005). The Sixth Circuit has also declined to find

---

subjective state of mind." *Harrington*, 562 U.S. at 110. If the Michigan Court of Appeals conceived of a sound strategy that includes the challenged action, the matter is resolved.

ineffective assistance of counsel where counsel's failure to request a lesser-included voluntary manslaughter instruction was consistent with the defendant's effort to seek a full acquittal on the basis of self-defense. *See Lewis v. Russell*, 42 F. App'x 809, 810–11 (6th Cir. 2002). Similarly, in *Edwards v. Mack*, the Sixth Circuit concluded that counsel was not ineffective for waiving jury instructions for lesser-included offenses where counsel and the defendant hoped to obtain an acquittal on the murder charge. *See Edwards v. Mack*, 4. F. App'x 215, 217–18 (6th Cir. 2001). Overall, the Sixth Circuit has concluded that such a "high risk, high reward" strategy is reasonable when there is sufficient evidence in the record to support a chance of acquittal. *See Kelly v. Lazaroff*, 846 F.3d 819, 830 (6th Cir. 2017); *see also Harrop v. Sheets*, 430 F. App'x 500, 507 (6th Cir. 2011) (discussing that counsel could have reasonably decided not to request a lesser offense instruction because such an instruction "would have diluted the other arguments [counsel] was advancing to the jury").

In Petitioner's case, there was evidence in the record to support a determination that Petitioner was not the individual who had shot the victim. On direct examination, Sheely testified that when he provided a written statement to the police, he was shown two photographs—one of a man wearing a Bears jacket, and one of a man in a black jacket and black hoodie. (Trial Tr. II, ECF No. 7-10, PageID.473.) Thereafter, Sheely was contacted by the police about viewing a photo lineup. (*Id.*, PageID.474.) Sheely testified that when shown the lineup, he believed that he recognized a photo of a man in a black jacket as the shooter. (*Id.*, PageID.476.) When asked, however, if he recognized anyone in the courtroom that had been in the limo on the date of the incident, Sheely replied that he did not. (*Id.*, PageID.477–478.)

Had Sheely been the only witness from the incident who testified at trial, there may have been a foundation for the jury to acquit Petitioner of murder. However, as the court of appeals

noted, Zaborowski identified Petitioner in court as the shooter, and Etchen identified Petitioner's photograph as the shooter. *See Austin*, 2020 WL 220018, at *2 n.1. Petitioner has presented no evidence to overcome those factual determinations.

While the court of appeals properly noted that the evidence presented at trial—namely, evidence that Lowe had accused Petitioner of selling him inferior cocaine and that Lowe had lunged at Petitioner before the shots were fired—could support a voluntary manslaughter instruction, requesting such an instruction would have been a marked departure from Petitioner's defense theory that he was not the shooter. Under Michigan law, voluntary manslaughter is "[t]he act of killing, through intentional, . . . committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control." *People v. Mendoza*, 664 N.W.2d 685, 690 (Mich. 2003). If counsel had requested a lesser-included voluntary manslaughter instruction, Petitioner would have essentially been conceding that he did shoot the victim but did so in the heat of passion. Such a concession would have been inconsistent with Petitioner's defense theory that he was not the shooter.

In sum, Petitioner's situation is quite similar to the one presented in *Tinsley*, where the Sixth Circuit concluded that counsel was not ineffective for failing to request a lesser-included manslaughter instruction because the petitioner maintained that he was not the one who had shot the victim. *See Tinsley*, 399 F.3d at 808. Moreover, counsel's decision to not request a voluntary manslaughter instruction did not prejudice Petitioner. As noted *supra*, the trial court instructed the jury regarding both felony murder and second-degree murder. (Trial Tr. V, ECF No. 7-13, PageID.967–971.) Given that "the jury chose felony murder over second-degree murder, there is

25

no basis to believe that it would have opted for the even lesser offense of voluntary manslaughter over felony murder." *See Abdus-Samad v. Bell*, 420 F.3d 614, 628 (6th Cir. 2005).

Petitioner has failed to show that the court of appeals' rejection of this claim of ineffective assistance was contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief with respect to habeas ground IV.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate

of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

### <u>Conclusion</u>

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.


Dated:     <u>May 17, 2024</u>          <u>/s/ Robert J. Jonker</u>
                                            Robert J. Jonker
                                            United States District Judge